# 14-1212-CV

# United States Court of Appeals

*for the*

# Second Circuit

———————————————————

AMERICAN HOME ASSURANCE COMPANY,
as subrogee of Crown Equipment Corporation,

*Plaintiff-Appellant,*

— v. —

A.P. MOLLERMAERSK A/S and/or MAERSK LINES
doing business as MaerskSealand,

*Defendant-Appellee,*

A.P. MOLLERMAERSK A/S and/or MAERSK LINES,

*Third-Party Plaintiff-Cross-Defendant,*

*(For Continuation of Caption See Inside Cover)*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR
## PLAINTIFF-APPELLANT

MARSHALL DENNEHEY WARNER
COLEMAN & GOGGIN, P.C.
*Attorneys for Plaintiff-Appellant*
Wall Street Plaza
88 Pine Street, 21st Floor
New York, New York 10005
(212) 376-6400

BNSF RAILWAY COMPANY,

*Third-Party Defendant-Counter-Defendant,*

PANALPINA, INC.,

*Defendant-Cross-Claimant-Counter-Claimant.*

## CORPORATE DISCLOSURE STATEMENT

Appellant, American Home Assurance Company as subrogee of Crown Equipment Corporation, by its attorneys Marshall Dennehey Warner Coleman & Goggin, pursuant to Rule 7.1 of the Federal Rules of Civil Procedure and Rule 26.1 of the Federal Rules of Appellate Procedure, states that it is a New York corporation and a subsidiary of American International Group, Inc. ("AIG"), a publicly held corporation.

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ....................................................................... iii

JURISDICTIONAL STATEMENT .............................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW .....................2

STATEMENT OF THE CASE ....................................................................4

SUMMARY OF ARGUMENT ...................................................................5

STATEMENT OF FACTS ...........................................................................6

    I.    Procedural History ............................................................................8

    II.   Documentary Evidence ..................................................................11

ARGUMENT ..............................................................................................15

    I.    Standard of Review ........................................................................15

    II.   By Its Own Contract, Maersk Assumed Liability For BNSF's Negligence ..15

    III.  The Court Erred In Finding That Clause 6.2(d) of Maersk's Multimodal Bill of Lading Is Only A Choice Of Law Provision ...........................................20

    IV. Plaintiff Has Established BNSF's Negligence, And Therefore, Maersk's Liability ..........................................................................................24

    V.   The Voluntary Dismissal of BNSF As A Third-Party Defendant Should Not Have Been Approved By The Court ...........................................29

CONCLUSION ...........................................................................................32

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) .....................34

CERTIFICATE OF SERVICE .................................................................35

ii

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Astilleros Espanoles S.A. v. Standard Oil Co. (Indiana)*, 464 U.S. 864 (1983)......30

*Bellefonte Reinsurance Co. v. Aetna Casualty & Surety Co.*, 903 F.2d 910 (2d Cir. 1990) ....................................................................................................15

*Belt Painting Corp. v. TIG Ins. Co.*, 100 N.Y.2d 377 (2003)……………………..15

*Breed v. Ins. Co. of N. Am.*, 46 N.Y.2d 351 (1978) ................................................21

*Eastern Fish Co. v. S. Pac. Shipping Co.*, 105 F. Supp. 2d 234 (S.D.N.Y. 2000) ..17

*Feiger v. Tidex, Inc.*, 826 F.2d 1435 (5th Cir. 1987) ................................................30

*Great White Fleet (US) Ltd. v. DSCV Transp., Inc.*, 2000 U.S. Dist. LEXIS 14501 (S.D.N.Y. Oct. 5, 2000) ..........................................................................................16

*In re Oil Spill by Amoco Cadiz*, 699 F.2d 909 (7th Cir.) ..........................................31

*JA Apparel Corp. v. Abboud,* 568 F.3d 390 (2d Cir. 2009) .....................................21

*Leather's Best, Inc. v. S.S. Mormaclynx*, 451 F.2d 800 (2d Cir. 1971) ..................30

*Litchmore v. Perez*, 17 Misc. 3d 1123(A), 851 N.Y.S.2d 70 (2007)......................17

*Ment Bros. Iron Works Co. v. Interstate Fire & Cas.*, 702 F.3d 118 (2d Cir. 2012)………………………………………………………………………………15

*Misano Di Navigazione, SPA v. United States*, 968 F.2d 273 (2d Cir. 1992)........................................................………………..16-17

*Rocco Carriers Ltd. v. M/V Nurnberg Express*, 899 F.2d 1292 (2d Cir. 1990) ......30

*Royal & Sun Alliance Ins. v Ocean World Lines, Inc.*, 612 F.3d 138 (2d Cir. 2010) ...............................................................................................................18

*Youssef v. Tishman Construction Corp.*, 744 F.3d 821 (2d Cir. 2014) ..................15

**Statutes**

28 U.S.C. § 1291 .................................................................................1

28 U.S.C. § 1331 .............................................................................1, 29

28 U.S.C. § 1332 .................................................................................1

28 U.S.C. § 1333 .................................................................................1

28 U.S.C. § 1337 .................................................................................1

49 U.S.C. § 14706…………………………………………………………….8

## JURISDICTIONAL STATEMENT

The United States District Court for the Southern District of New York attained subject matter jurisdiction in this matter because the action arises from an intermodal carriage of goods in interstate and international commerce, and is governed by federal common law and federal statutes pursuant to 28 U.S.C. §§ 1331 and 1337 (Appendix-25-26, hereinafter A-25-26; A-39-40), and is an admiralty or maritime action within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and pursuant to 28 U.S.C. § 1333.  (A-26; A-32).  Subject matter jurisdiction was also attained pursuant to 28 U.S.C. § 1332 in that diversity of citizenship exists between the parties, and the amount in controversy exceeds the sum of $75,000, exclusive of costs and interest.  (A-26; A-40).

Appellate jurisdiction pursuant to 28 U.S.C. § 1291 vests in the United States Court of Appeals for the Second Circuit because a final order was entered on March 31, 2014 (Special Appendix-1-19, hereinafter SPA-1-19), and a Notice of Appeal was timely filed and served on April 17, 2014.  (A-949).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.    Did the District Court err when it found that Plaintiff-Appellant, American Home Assurance Company, as subrogee of Crown Equipment Corporation ("American Home" or "Crown" or "Plaintiff" or "Appellant") which had, without dispute, suffered damage to its cargo, did not have any remedy against Defendant-Appellee, A.P. Moller-Maersk A/S ("Maersk"), despite Maersk's contractual agreement to assume liability for cargo damage during inland carriage in the United States while the cargo is in the custody of Maersk's subcontractors?

2.    Did the District Court err when it found that Clause 6.2(d) of the Maersk multimodal bill of lading is purely a choice of law provision, and ignored the language of  the same provision requiring that Maersk's liability is to be determined "in accordance with the contract of carriage or tariff of any inland carrier in whose custody the loss occurred"?

3.    Did the District Court err in failing to find that Maersk was liable in contract to plaintiff pursuant to BNSF's Intermodal Rules and Policies Guide, namely $250,000 per shipment for each of the three shipments?

4.    Did the District Court err in approving the voluntary dismissal of BNSF as a third-party defendant, which had been brought into the litigation by Maersk pursuant to Rule 14(c) of the Federal Rules of Civil Procedure,

without the consent of plaintiff, particularly considering that BNSF had fully briefed and argued its defenses on the merits directly with plaintiff in respect of the parties' motions and cross-motions for summary judgment?

## <u>STATEMENT OF THE CASE</u>

This Brief is submitted by American Home Assurance Company, as subrogee of Crown Equipment Corporation, in support of American Home's appeal from the Order rendered March 31, 2014 (United States District Court for the Southern District of New York,  U.S.D.J. Paul G. Gardephe), which granted the motion of Appellee A.P. Moller-Maersk A/S for summary judgment, and effectively denied the motion of American Home for summary judgment.  (SPA-1-19).

# SUMMARY OF ARGUMENT

In the first instance, this is a breach of contract case, and one to be determined by general principles of contract interpretation.

Maersk's multimodal bill of lading purports to preclude the shipper, Crown, from suing BNSF (or any other subcontractor) (A-262). At the same time, however, the bill of lading provided, in Clause 6.2(d), that Maersk's liability to Crown would be determined in accordance with BNSF's contract of carriage or tariff. (A-263-264). Thus, Maersk's liability to American Home, as Crown's subrogee, is governed by BNSF's Intermodal Rules, incorporated by reference into the contract of carriage between Maersk and BNSF, entitled The International Transportation Agreement ("the ITA"). (A-102-113, specifically A-106).

Under BSNF's Intermodal Rules, BNSF's limitation of liability is $250,000 per shipment. (A-185). Since three (3) separate shipments are involved, the aggregate limitation of liability would thus be $750,000. Inasmuch as the total value of the claim (before the calculation of interest) is $332,329.92, the damages at issue do not exceed the amount of the applicable limitation of liability.

Furthermore, Maersk's status as an ocean carrier is of no consequence to Maersk's liability to plaintiff. Maersk's liability arises from its assumption of BNSF's liability pursuant to Clause 6.2(d) of the Maersk multimodal bill of lading.

## STATEMENT OF FACTS

American Home is a domestic corporation incorporated in the State of New York.  Its subrogor, Crown, is an Ohio corporation, which manufactures, among other things, industrial forklift trucks.  (A-26; A-322-323).

This case, involving three separate shipments, arises out of the multimodal carriage of goods shipped by Crown from its facilities in Bremen, Ohio and Green Castle, Indiana to Melbourne, Australia via the Port of Long Beach, California.  Crown initially engaged the services of Panalpina, Inc., a freight forwarder, to make the arrangements for the transportation.  In turn, Panalpina retained Maersk to perform the entire transportation.  (A-222; A-231-233; A-238; A-243-244).  It is undisputed that the terms and conditions of Maersk's multimodal bill of lading governed the contractual relationship between Crown and Maersk (A-226), notwithstanding the fact that Maersk's three separate multimodal bills of lading had not yet been issued, since the cargo had not yet been loaded upon Maersk's vessels, MAERSK NOVAZZANO and HANSA BERGEN at Long Beach, California.  (A-223-224).

In order to effectuate the onward land portion of the transportation from Illinois, Maersk contracted with  Burlington Northern Santa Fe Railway Company

6

("BNSF") to perform the rail carriage of the shipments from BNSF Logistic Park in Elwood, Illinois[1] to the Port of Long Beach. (A-226-227; A-773).

BNSF issued three (3) separate movement waybills covering the rail segment of the carriage from Illinois to Long Beach. (A-98-100). The BNSF waybills show that the three (3) shipments were received by BNSF without notation of any exceptions as to their condition. (A-98-100). BNSF's Federal Rules of Civil Procedure ("FRCP") 30(b)(6) witness, Ronald Hamilton, the Director of BNSF's Freight Claim Department in Topeka, Kansas, testified that each of the three containers containing Crown's cargo constituted a shipment. (A-583). Maersk also concedes that this claim involved three separate shipments. (A-222).

On December 22, 2006, while Crown's containers were being transported by BNSF's locomotive, the locomotive derailed from rail tracks maintained and controlled by BNSF near Newberry Springs, California, resulting in damage to the containers and their contents. (A-227).

Crown filed an insurance claim with American Home and was compensated for its loss. American Home now pursues recovery from Maersk as Crown's subrogated cargo underwriter. (A-28).

---

[1] The shipments were carried by John Cheeseman Trucking & BTT via tractor trailer from Bremen, Ohio and Green Castle, Indiana to Elwood, Illinois.

## I.    **Procedural History**

On November 30, 2007, American Home, as Crown's subrogee, commenced this action against Maersk and Panalpina.[2]  The complaint asserted causes of action for breach of contract, breach of bailment and negligence.  The case was initially assigned to Judge Barbara S. Jones.  (A-25-30).

On February 6, 2008, Maersk impleaded BNSF pursuant to Rule 14(c) of the FRCP.  (A-38-45).  Of particular relevance, Maersk not only sought indemnification and contribution from BNSF, it also asserted, pursuant to FRCP 14(c), that BNSF was directly liable, in whole or in part, to Plaintiff.  Specifically, in its prayer for relief, Maersk  requested that "Judgment be granted in favor of Plaintiff [American Home] directly against BNSF pursuant to Rule 14(c) of the Federal Rules of Civil Procedure".  (A-42).

Maersk and BNSF both moved for partial summary judgment in November 2009.  (A-55-57; A-306-307).  BNSF argued that its liability, if any, to American Home, was limited by reason of the United States Carriage of Goods by Sea Act's ("U.S. COGSA") $500 per package limitation.  (A-309).  Maersk sought, *inter alia*, summary judgment on its indemnity claim against BNSF.  (A-56; A-62).  On February 16, 2011, Judge Jones denied both motions.  (A-750-767).  Concluding that the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 14706

---

[2] On February 13, 2009, American Home stipulated to Panalpina's dismissal from the action as Panalpina acted only as a freight forwarder, not as a carrier.

("Carmack Amendment"), and not COGSA, governed BNSF's liability to plaintiff, the Court found that BNSF could not avail itself of the COGSA limitation.  (A-764).  The Court also rejected Maersk's claim for indemnification from BNSF as premature.  (A-766).

On March 8, 2012, American Home moved for summary judgment on the issues of liability and damages against Maersk and BNSF.  (A-770-771).  Both Maersk and BNSF filed opposition to plaintiff's motion.  (A-806-818).  In its opposition to American Home's motion for summary judgment, Maersk did not contest American Home's theory on the issue of liability.  Rather, Maersk admitted that the damage to Crown's cargo was caused by the derailment of BNSF's train near Newberry Springs, California on December 22, 2006, and, more specifically, that the derailment was caused by a long standing, patent, rail track defect which BNSF had failed to correct.  (A-807).

On December 11, 2012, while American Home's  fully briefed motion against Maersk and BNSF was pending adjudication, Maersk and BNSF filed a Stipulation of Dismissal of BNSF as a party, with prejudice.  (A-826-828).  On January 4, 2013, Judge Jones entered an Order finding the Stipulation to be defective in that it lacked the consent of the plaintiff, American Home.  (A-829-834).

9

After Judge Jones resigned from the bench, the case was then temporarily transferred to Chief Judge Loretta A. Preska. BNSF sought reconsideration of Judge Jones's January 4, 2013 Order (A-835-837), and Judge Preska concluded that since the Carmack Amendment, and not COGSA, governed this dispute, any maritime claims were pre-empted, stating "the Carmack Amendment provides the exclusive remedy for a shipper's compensation for actual loss or injury." (A-891-897). As a result, Judge Preska vacated Judge Jones's Order, and "So Ordered" the Stipulation dismissing BNSF with prejudice. (*Ibid*).

Judge Preska then stayed further briefing regarding American Home's motion for summary judgment, and granted Maersk permission to move for summary judgment. (A-914). Maersk then moved for summary judgment, arguing that Maersk, as an ocean carrier, cannot be held liable to plaintiff under the Carmack Amendment. (A-915-917). The case was transferred to Judge Gardephe on May 29, 2013.

On September 26, 2013, the Court denied American Home's motion for summary judgment, without prejudice, and subject to reinstatement after determination of Maersk's summary judgment motion. (A-947-948).

On March 31, 2014, the Court granted Maersk's motion for summary judgment. (SPA-1-19). It found that Maersk could not be statutorily liable under the Carmack Amendment since Maersk was neither a receiving nor a delivering

10

rail carrier, and was not a freight forwarder. (SPA-11-14). The Court also found that Maersk had not contracted into Carmack liability. (SPA-14-18). It reasoned that Clause 6.2(d) of the Maersk multimodal bill of lading was nothing more than a choice of law provision requiring Maersk's liability "to be adjudged according to its contract with BNSF and in accordance with New York law". The Court stated, "there is no evidence that, in agreeing to this provision, the parties intended that Maersk would be bound by the liability rules set forth in the Carmack Amendment". (SPA-18).

As will be demonstrated, Clause 6.2(d) of the Maersk multimodal bill of lading is clearly more than a choice of law provision, and, quite to the contrary of Judge Gardephe's reasoning, evinces a clear intent that where the cargo was damaged during inland carriage in the United States, Maersk's liability is to be determined in accordance with the terms of the contract of carriage or tariff of the inland carrier, in this case BNSF, regardless of whether Maersk is an ocean carrier.

## II.    <u>Documentary Evidence</u>

Two documents issued in conjunction with the transportation are relevant to this appeal. The first is the Maersk multimodal bill of lading. The three multimodal bills of lading (A-235-236; A-240-241; A-246-247) were never actually issued by Maersk for this transportation, since, by custom, Maersk would issue hard copies only after the shipment had arrived at the port of loading for

11

outbound ocean transportation. (A-223-224). Nonetheless, electronic copies were generated, and there is no dispute that the electronic copies incorporate all of the terms and conditions of Maersk's form multimodal bill of lading. Maersk's multimodal bill of lading contained the following provisions relevant to this appeal:

**1.    Definitions**

"Carriage" means the whole or any part of the carriage, loading, unloading, storing, warehousing, handling and any and all other services whatsoever undertaken by the Carrier in relation to the Goods.

"Carrier" means A.P. Moller-Maersk A/S trading as Maersk Sealand of 50 Esplanaden, DK-1098, Copenhagen K, Denmark.

*****

"Merchant" includes the Shipper, Holder, Consignee, Receiver of the Goods, any Person owning or entitled to the possession of the Goods or of this bill of lading and anyone acting on behalf of such Person.

"Multimodal Transport" arises if the Place of Receipt and/or the Place of Delivery are indicated on the reverse hereof in the relevant spaces.

*****

"Port-to-Port Shipment" arises when the Carriage is not Multimodal.

"Subcontractor" includes owners, charterers and operators of vessels (other than the Carrier), stevedores, terminal and groupage operators, road and rail transport operators, warehousemen and any independent contractors employed by the Carrier performing the Carriage and any direct or indirect. Subcontractors, servants and agents thereof whether in direct contractual privity or not.

12

\*\*\*\*\*

## 4.     Subcontracting

**4.2**     The Merchant undertakes that no claim or allegation whether arising in contract, bailment, tort or otherwise shall be made against any servant, agent, or Subcontractor of the Carrier which imposes or attempts to impose upon any of them or any vessel owned or chartered by any of them any liability whatsoever in connection with the Goods or the Carriage of the Goods whether or not arising out of negligence on the part of such Person, and if any such claim or allegation should nevertheless be made, to indemnify the Carrier against all consequences thereof…

\*\*\*\*\*

## 6.     Carrier's Responsibility – Multimodal Transport

Where the Carriage is Multimodal Transport, the Carrier undertakes to perform and/or in his own name to procure performance of the Carriage from the Place of Receipt or the Port of Loading, whichever is applicable, to the Port of Discharge or the Place of Delivery, whichever is applicable, and, save as is otherwise provided for in this bill of lading, the Carrier shall be liable for loss or damage occurring during the Carriage only to the extent set out below:

**6.2** Where the stage of Carriage where the loss or damage occurred is known.  Notwithstanding anything provided for in clause 6.1 and subject to clause 18, the liability of the Carrier in respect of such loss or damage shall be determined:

\*\*\*\*\*

 **(d)** If the loss or damage is known to have occurred during Carriage inland in the USA, in accordance with the contract of carriage or tariffs of any inland carrier in whose custody the loss or damage occurred or, in the absence of such contract or tariff by the provisions of Clause 6.1, and in either case the law of the State of New York will apply.

13

*****

## 26.   Law and Jurisdiction

Whenever clause 6.2(d)  . . . applies, whether by virtue of Carriage of the Goods to or from the United States of America or otherwise, that stage of the Carriage is to be governed by United States law and the United States Federal Court of the Southern District of New York is to have exclusive jurisdiction to hear all disputes in respect thereof.

(A-259-272).

The other relevant contract in this case is the contract of carriage between Maersk and BNSF, the ITA.  (A-102-113).  The ITA does not contain a limitation of liability provision.  (*Id.*)  It does, however, incorporate BNSF's Intermodal Rules and Policies Guide ("BNSF Intermodal Rules").  (A-106).  The ITA states in pertinent part, "Transportation shall be governed by the terms and conditions herein and those set forth in 'BNSF Intermodal Rules and Policies Guide'…"  (*Id.*) Item 63 of the BNSF Intermodal Rules specifically states that BNSF has a $250,000.00  limitation of liability per shipment.  (A-185-187).

Furthermore, BNSF's Intermodal Rules define "shipment" as "[e]quipment, freight, traffic, unit, movement, or lading tendered with shipping instructions at the origin, for movement to a destination, regardless if it is a load or empty."  (A-202). It is thus undisputed that each of Crown's three containers of forklifts and forklift parts, which moved under three separate movement waybills, constituted a "shipment" within the definition of BNSF's Intermodal Rules.

14

# ARGUMENT

## I.    Standard of Review

Inasmuch as the issue is one of "a pure textual construction",  in which the District Court granted summary judgment, the District Court's determination is subject to *de novo* review.  See, *Bellefonte Reinsurance Co. v. Aetna Casualty & Surety Co.*, 903 F.2d 910, 912 (2d Cir. 1990);   also, *Youssef v. Tishman Construction Corp.*, 744 F.3d 821, 824 (2d Cir. 2014) - the applicability of Rule 41(a)(1)(A)(i) to plaintiff's claim is a "legal question which we review *de novo*".

Furthermore, any review of the grant of a motion for summary judgment requires that the record be reviewed "in the light most favorable to [the] appellant'".  (*Bellefonte*, supra 903 F.d at 212).

## II.    By Its Own Contract, Maersk Assumed Liability For BNSF's Negligence

Fundamental to the issues on this appeal are the provisions in Maersk's multimodal bill of lading, the contract of carriage between Maersk and Crown. Initially, it is worth noting that the bill of lading provisions were drafted by Maersk, so even if there was any ambiguity in its provisions, at a minimum they must be construed against Maersk, (*Ment Bros. Iron Works Co. v. Interstate Fire & Cas.*,  702 F.3d 118, 124 (2d Cir. 2012) (citing *Belt Painting Corp. v. TIG Ins. Co.*, 100 N.Y.2d 377, 383 (2003)), and would preclude the grant of summary judgment to Maersk.

15

For instance, Clause 6.2(d) of the Maersk multimodal bill of lading provides, in part, that New York law governs where the location of the loss of cargo during inland carriage in the United States is known.  (A-263-264).  On the other hand, Clause 26 provides that whenever Clause 6.2(d) applies, "this stage of the carriage is to be governed by United States law . . ."  (A-271-272).  Thus, it is evident that the language of the Maersk multimodal bill of lading itself has created the confusion as to whether the Carmack Amendment may be applicable contractually, because it provides for the applicability of both New York and federal law for loss during inland carriage in the United States.  If nothing else, the District Court's finding that Clause 6.2(d) is simply a choice of law provision is undermined by the language of Clause 26.

It is submitted, however, that regardless of what law applies, there is only one rational interpretation of the liability provisions of Maersk's multimodal bill of lading – in Clause 6.2(d), Maersk assumed liability for BNSF's negligence, and obligated itself to compensate Crown pursuant to the scheme outlined in BNSF's Intermodal Rules, at least up to the limitation of liability of $250,000 per shipment.

"In interpreting contract provisions, courts must attempt to identify the parties' intent as expressed in the contractual language."  *Great White Fleet (US) Ltd. v. DSCV Transp., Inc.*, 2000 U.S. Dist. LEXIS 14501, 3 (S.D.N.Y. Oct. 5, 2000) (citing *Misano Di Navigazione, SPA v. United States*, 968 F.2d 273, 275 (2d

Cir. 1992)). *See also, Litchmore v. Perez*, 17 Misc. 3d 1123(A), 851 N.Y.S.2d 70 (2007). "Under general contract principles, a party is bound by the provisions of a contract that he signs unless he can show special circumstances that would relieve him of such an obligation." *Eastern Fish Co. v. S. Pac. Shipping Co.*, 105 F. Supp. 2d 234, 237 (S.D.N.Y. 2000).

Firstly, the Maersk multimodal bill of lading specifically provided, in Clause 4.2, that Crown could not make a claim against any of Maersk's subcontractors (which include BNSF) for "any liability whatsoever in connection with the Goods or the Carriage of the Goods whether or not arising out of negligence on the part of such Person . . ."[3] (A-262).

Instead, Maersk assumed the entire responsibility for the transportation of the cargo, and thus placed itself in the position that BNSF would have been had BNSF contracted directly with Crown. More specifically, Clause 6 of the Maersk bill of lading provided that where the transportation of the cargo was to be multimodal, Maersk agreed "to procure performance of the Carriage from the Place of Receipt . . . to the Port of Discharge or Place of Delivery, whichever is applicable . . ." (A-263). Clause 6 then provided that Maersk "shall be liable for

---

[3] Maersk assumed full liability to the plaintiff for the performance of Maersk's Subcontractors. Whether Maersk now has any recourse against BNSF for indemnification or contribution is of no consequence to plaintiff's entitlement to the full amount of its damages from Maersk.

loss or damage occurring during the Carriage" (*Id*.), pursuant to the provisions of Clauses 6.1 through 6.4.

Clause 6.1 addressed the situation where the stage of the transportation where the loss or damage occurred is <u>not</u> known.  (*Id*.) (Emphasis added).  Since it is not disputed that the damage occurred during BNSF's rail carriage, and more specifically, as a result of the derailment occurring near Newberry Springs, California, Clause 6.1 is clearly inapplicable.

On the other hand, Clause 6.2 addresses Maersk's liability in the situations where "the stage of Carriage where the loss or damage occurred <u>is</u> known".  (*Id*.) (Emphasis added).

Subsection (a) is applicable to those circumstances which are governed by international convention or national law that cannot be departed from by private contract to the shipper's detriment.  (*Id*.)  Since this Court has held in *Royal & Sun Alliance Ins. v Ocean World Lines, Inc.*, 612 F.3d 138, 146 (2d Cir. 2010),  that the Carmack Amendment is not a "national law" that "cannot be departed from", subsection (a) is thus inapplicable.[4]

Likewise, subsections (b) and (c) are inapplicable since they involve loss at sea or loss at a container yard immediately adjacent to the sea terminal.  (A-264).

---

[4] The bill of lading language in *Royal & Sun*, however, did not incorporate the key language found in clause 6.2(d) of Maersk's multimodal bill of lading here.

Subsection (d), however, is the relevant provision.  It states:

> ["Where the stage of Carriage  where the loss or damage occurred is known . . . the liability of [Maersk]  in respect of such loss or damage shall be determined:]
>
> *   *   *
>
> (d) if the loss or damage is known to have occurred during Carriage inland in the USA, in accordance with the contract of carriage or tariffs of any inland carrier in whose custody the loss or damage occurred , or in the absence of such contract or tariff by the provisions of Clause 6.1, and in either case the law of the State of New York will apply . . . . "

(A-263-264).

It is undisputed that the damage in this case occurred while the cargo was in BNSF's possession during inland carriage in the United States.   (A-807).  Consequently, the provisions of Clause 6.2(d) make clear that it is BNSF's Intermodal Rules  which govern Maersk's liability.

Additionally, as can be seen, the provisions of Maersk's multimodal bill of lading make irrelevant Maersk's status as an ocean carrier.   Maersk's responsibilities to Crown turn, not on whether it is or is not an ocean carrier, but, rather, on the obligations it assumed when it agreed to be bound by BNSF's contract of carriage.

Item 63 of BNSF's Intermodal Rules, which are incorporated by reference into BNSF's contract of carriage, the ITA, provides that BNSF has a limitation of liability of $250,000 per shipment.  (A-185).  As noted by Judge Gardephe, Maersk

had argued in the initial round of motions, that even if it were liable to plaintiff, its liability would be capped at $250,000 per shipment. (SPA-14-15). In addition, BNSF had argued in the alternative that its liability would be limited to $250,000.[5] (Maersk's and BNSF's Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment, 07-cv-10947, Document 77, pages 6 and 7, not reproduced herein). It is evident that Maersk and BNSF, in the face of a $332,329.92 claim arising out of BNSF's negligence, considered it to be advantageous that BNSF's Intermodal Rules, including BNSF's limitation of liability, governed the parties' responsibilities. What BNSF overlooked, however, was that there were three (3) separate shipments, so that BNSF's (and hence Maersk's) actual limitation was $750,000, an amount in excess of the actual claim of $332,329.92.

It is thus undisputed that the terms and conditions of Maersk's multimodal bill of lading govern Crown's cargo claims in this case, and that pursuant to the terms and conditions of the multimodal bill of lading, Maersk agreed to accept responsibility for the entire transportation.

## III.  The Court Erred In Finding That Clause 6.2(d) of Maersk's Multimodal Bill of Lading Is Only A Choice Of Law Provision

In its Memorandum Opinion and Order, the Court specifically found that under Clause 6.2(d), Maersk did not agree to be bound by the liability regime that

---

[5] However, BNSF failed to take into account the "per shipment" language in Item 63 of its own Intermodal Rules.

governs BNSF, and that Clause 6.2(d) was only a choice of law provision providing that, in the event a shipment of goods is damaged during carriage in the inland United States, Maersk's liability is to be adjudged according to its contract with BNSF and in accordance with New York law.  (SPA-18).

As noted in Point II above, even the finding that New York law governs is called into question by the language of Clause 26, which provides that federal law governs factual scenarios arising out of situations where Clause 6.2(d) is applicable.  (A-271-272).

In any event, it is respectfully submitted that the Court's conclusion that Clause 6.2(d) was solely a choice of law provision constituted legal error, as the Court ignored  basic contract interpretation principles, including the directive  that all the words of a contract be given meaning so that an individual provision cannot be deemed superfluous. *JA Apparel Corp. v. Abboud,* 568 F.3d 390, 396 (2d Cir. 2009) (quoting *Breed v. Ins. Co. of N. Am.*, 46 N.Y.2d 351, 355 (1978)).  A plain reading of Clause 6.2(d) of the Maersk multimodal bill of lading reveals that it is comprised of three parts, two of which are in the disjunctive, and the third of which (the New York choice of law provision) is only conjunctive to the first two.

Initially, Clause  6.2(d)  states when damage is known to have occurred in a specific location (during inland carriage in the United States), Maersk's liability [to the Shipper – Crown] will be determined "in accordance with the contract of

21

carriage or tariffs of any inland carrier in whose custody the loss or damage occurred".  (A-263-264).

Secondly, Clause 6.2(d) provides that in the absence of such a contract or tariff, Maersk's liability will be governed by the provisions of Clause 6.1.  (*Id*.)

Thirdly, and only after it has been ascertained whether there is an existing contract of carriage, Clause 6.2(d)  provides that in either instance (whether there is or is not a contract of carriage or tariff), New York law will apply.  (*Id*.)

Thus, the choice of law language  in Clause 6.2(d) is not the sole purpose of the provision, and, indeed, its importance is secondary in rank to the primary intention of the Clause.  A clear and literal reading of Clause 6.2(d) makes evident that where there is a loss at a known inland location in the United States, Maersk's liability to its shipper will be determined in accordance with the contract of carriage or tariff of the inland carrier, in this case BNSF.  To the extent reference must be made to the law of any jurisdiction in adjudging Maersk's liability, then New York law will govern.   Regardless of whether Maersk contracted into Carmack liability (an issue that need not even be resolved), it is evident that Maersk assumed liability to Crown under BNSF's Intermodal Rules.

There would have been no reason to insert the language "in accordance with the contract of carriage or tariffs of any inland carrier in whose custody the loss

occurred" if all that the subsection was intended to do was to make New York law applicable.

In its decision, the District Court also stated: "There is no evidence that, in agreeing to this provision, the parties intended that Maersk would be bound by the liability rules set forth in the Carmack Amendment". (SPA-18). What the Court overlooked is that, regardless of whether the Carmack Amendment was applicable, BNSF agreed in its Intermodal Rules that its limitation of liability would be $250,000 per shipment for damage occurring while the cargo was in its custody. Thus, for purposes of ascertaining Maersk's liability to plaintiff, there was no need to determine whether Section 6.2(d) evinced an intent by the parties that Carmack would apply. Instead, what is determinative is that Maersk precluded Crown from making a direct claim against BNSF, but assumed liability for BNSF's actions, and agreed to the liability scheme outlined in BNSF's Intermodal Rules.

To reason otherwise is to draw the conclusion that Maersk contractually precluded Crown from having any recourse against any carrier whose negligence damaged its goods, while at the same time entirely disclaiming its own liability to Crown. Indeed, such an interpretation would make all the provisions of Clause 6.2 superfluous.

**IV.    Plaintiff Has Established BNSF's Negligence, And Therefore, Maersk's Liability**

With BNSF having been dismissed as a third-party defendant (by virtue of Maersk's and BNSF's strategic manipulation), Maersk is attempting to, all-of-a-sudden, completely free itself from liability to plaintiff.  However, throughout the course of this litigation, Maersk has failed to contest plaintiff's case on the issue of liability.  It is respectfully submitted that Maersk's liability is undisputed by reason of Maersk's assumption of BNSF's liability, which is also undisputed and which Maersk has argued in favor of at length below.

Maersk was given the opportunity to survey, and did in fact survey, the damage.  The findings articulated in the survey report prepared on behalf of Maersk, dated February 15, 2007, constitute admissions by Maersk.  (A-278-292).  Furthermore, plaintiff furnished Mr. Leon Homan, the traffic manager for Crown Equipment Corporation, for deposition.  Mr. Homan testified in respect of the loading of the containers at Crown's facilities in Ohio and Indiana and in support of the actual good order and condition of the cargo at the time it left plaintiff's custody.  (A-348-354; A-365-369; A-372-378).

Mr. Ronald Hamilton, BNSF's FRCP 30(b)(6) witness, whose department received, investigated and settled claims involving BNSF (A-644-645), testified that a train owned by BNSF derailed on December 22, 2006 at Newberry Springs., California, also known as Needles, California.  (A-646; A-656).

24

Mr. Hamilton identified a BNSF incident report dated December 23, 2006 and testified that he was unaware of any fact which would indicate that weather was a factor in the derailment.  (A-62, referencing A-656).  The December 23, 2006 report stated, "Train travelling west on MT-1 on tangent track while on ascending grade of 0.11% when lead engine 'dropped within the gage side of the rail resulting in derailment of the above equipment as indicated above.'  Vehicles present at the site had been in the process of 'repairing the Detector defects'."  These two unoccupied vehicles were destroyed as a result of the derailment, with an additional estimated loss of container shipments carried by the train of $1,377,950.  (A-63).

On December 29, 2006, Maersk made an email inquiry to Mr. Hamilton as follows: "May I assume that BNSF will not declare *Force Majeure'* and therefore all claims will be handled/honored in the usual manner."  Mr. Hamilton responded, "This incident is still under investigation by BNSF and the final cause is yet to be determined, but at this time we have received no notice or indication of a *'Force Majeure'* presently being considered by BNSF."  (A-63).  Mr. Hamilton testified that there never came a time when he believed that there was *force majeure* event that caused the derailment.  (A-63, referencing A-658-659).

Mr. Geoffrey Dahlman, the Director of Research and Tests for BNSF, prepared a report dated January 19, 2007 on the cause of the derailment.  He noted

25

there was a failed joint and six failed rails. He observed that a large amount of "rubbing batter" noted in a side joint bar, "indicated that it had been broken for some time." He found there was a rail end mis-match of 5/32", which was 1/32" over the allowable tolerance according to the FRA Track Safety Standards. He concluded:

> "**Discussion/Conclusion**
>
> The receiving rail head batter indicates that the 5/32" head difference was contributory to the rapid fatigue of the joint bars. Also note, no corrosion was present on the old brake surfaces indicative of rapid fatigue. After the field side joint bar failed, the continuing pounding of wheels to the higher rail head caused the receiving rail to be displaced 7/16" before the gage side joint bar failed."

(A-63-64, referencing A-80-96).

BNSF conceded that the reports identified in Mr. Hamilton's deposition were the only reports available as to the cause of the derailment and that there were no written statements relating to the derailment. (A-64).

When questioned at his deposition as to whether BNSF was asserting any of the defenses contained in sub-paragraphs a. through f. of the BNSF Intermodal Rules section titled "Loss or Damage" (A-186), Mr. Hamilton responded, "Not to my knowledge." (A-66, referencing A-674-675).

Mr. Hamilton further testified at his deposition as follows:

"Q. Would it be fair to state with respect to the claims of Crown Equipment Corporation that you are not contesting the liability but

26

rather the limitation that would apply, that is the issue and the reason why no payment has yet been made?

Ms. Tondel:  Objection.

You can answer.

A. Yes."

(A-66-67, referencing A-666).

Mr. Hamilton further admitted that he was unaware of any evidence that would indicate that the three Crown containers caused the derailment.  He stated that according to his knowledge, it was not BNSF's position that any of the three Crown containers caused the derailment. (A-723, referencing A-667-668).

Leon Homan of Crown testified under oath that even though Crown did not generate any documents in connection with the packing of the machinery into the three containers, an inspection was conducted to ensure that the goods were packed and secured properly. (A-723-724, referencing A-352-353).

Mr. Homan testified in detail as to how the machinery was packed and secured in each of the three containers and that Crown followed the ISO work process.  (A-724, referencing A-372-379).  There is nothing in this description which would indicate faulty packing or securing, nor has BNSF raised any specific allegation of improper packing and securing through evidence of surveyors or experts or otherwise. (A-724).

There is no evidence whatsoever to indicate that the trucking movements of the two containers from New Bremen, Ohio to Joliet, Illinois or the third container from Greencastle, Indiana to Joliet, Illinois were anything other than routine. When the containers arrived at the BNSF facility in Joliet, Illinois, they were sealed. It was not the practice of BNSF to open the containers and inspect the contents on receipt. (A-724, referencing A-670). It was the practice of BNSF to prepare an equipment inspection form for each container entering a BNSF facility. Mr. Hamilton indicated that such an inspection form should have been prepared with respect to these three containers, although BNSF never produced such a document. Mr. Hamilton indicated, however, that according to his knowledge, the equipment inspection form showed no exceptions as to the condition of these containers. (A-724, referencing A-674). BNSF has failed to produce any document indicating that it took an exception to the condition of any of the three containers on receipt. (A-725).

BNSF admits that the derailment occurred and that it caused damage to several shipments, including the Crown shipment. None of the investigative reports produced by BNSF relating to the cause of the derailment make any mention whatsoever as to improper packing or securing of the machinery in the containers as a cause of the derailment. (A-725).

28

It is without dispute that BNSF conducted an investigation of the derailment and concluded that it was due to a track defect in a rail system side joint bar which had been broken for some period of time prior to the derailment. (A-773; A-807).

It is also without dispute that BNSF's investigation concluded that the mismatch of rail track exceeded the allowable tolerances of the FRA Track Safety Standards and contributed to the derailment. (*Id*.)

## V.    The Voluntary Dismissal of BNSF As A Third-Party Defendant Should Not Have Been Approved By The Court

It is undisputed that plaintiff's claim against Maersk fell within the court's admiralty jurisdiction. See, 28 U.S.C. §1331(1). Plaintiff pleaded admiralty jurisdiction in its Complaint. (A-26). Maersk admitted that the case falls within the court's admiralty jurisdiction in its Answer to plaintiff's Complaint. (A-32).

Maersk invoked Rule 14(c) of the Federal Rules of Civil Procedure in its third-party Complaint against BNSF. (A-42). Rule 14(c) does not require that the third-party claim against the third-party defendant be an admiralty or maritime claim. Rule 14(c) merely provides that a third-party plaintiff may implead a third-party defendant on either an admiralty or non-admiralty claim so long as it arises out of the "same transaction, occurrence, or series of transactions or occurrences" as the original plaintiff's admiralty claim.

The rule in this Circuit and others has been that admiralty and non-admiralty claims may be joined in the same action so long as the claim against the non-

admiralty party "arises out of a common nucleus of operative facts with the admiralty claim and the resolution of the factually connected claims in a single proceeding would further the interests of conserving judicial resources and fairness to the parties". *Rocco Carriers Ltd. v. M/V Nurnberg Express*, 899 F.2d 1292 (2d Cir. 1990); *Leather's Best, Inc. v. S.S. Mormaclynx*, 451 F.2d 800, 809-11 (2d Cir. 1971); *Feiger v. Tidex, Inc.*, 826 F.2d 1435, 1439 (5th Cir. 1987); *In re Oil Spill by Amoco Cadiz*, 699 F.2d 909, 913-14 (7th Cir.) *cert denied sub nom*; *Astilleros Espanoles S.A. v. Standard Oil Co. (Indiana)*, 464 U.S. 864 (1983); see also, Advisory Committee Notes, Fed. R. Civ. P. Rule 9(h) 1997 Amendment.

Plaintiff's claims against Maersk for cargo damage, governed by Maersk's multimodal bill of lading, arise under the same occurrence as the non-admiralty negligence claim against BNSF for failure to properly maintain its track which caused BNSF's train to derail and plaintiff's cargo to become damaged. In *Leather's Best*, *supra*, Judge Friendly, writing for the majority, stated eloquently:

> …the rules of procedure in the admiralty and civil jurisdictions were merged in 1966, and we are of the opinion that at least since that merger, the constitutional rationale which underlies the doctrine of ancillary jurisdiction in the context of Rule 13(a) and Rule 14 may be applied to support the conclusion that a federal court has the power to hear a related state claim against a defendant not named in the federal claim regardless of whether the federal claim arises in the civil or admiralty jurisdiction.  Thus, we conclude that in a case such as this, where the facts underlying the state and federal claims are identical, a federal court vested with admiralty

> jurisdiction over a shipper's claim against the carrier for breach of contract of carriage does have the "power" also to entertain its state court claim against the pier operator. *Id., 451 F.2d at 810-811.*

Under the rationale of *Rocco Carriers* and *Leather's Best*, if the court has the power to maintain jurisdiction over a factually related state court claim where admiralty jurisdiction exists on the claim against a defendant/third-party plaintiff, there can be no doubt whatsoever that the Court below had the power to maintain jurisdiction over the non-admiralty claim against BNSF. Rule 41(a)(1)(A)(ii) requires the consent of all parties, including plaintiff. Maersk's and BNSF's attempt to circumvent the requirements of the Federal Rules, particularly when a fully briefed summary judgment motion against BNSF was pending adjudication, should not have been tolerated.

Notwithstanding Appellant's position that the Voluntary Stipulation of Dismissal of BNSF was improper and the Court's approval of BNSF's dismissal constituted legal error, it is respectfully submitted that the presence of BNSF in this litigation is not necessary for Appellant to obtain a full recovery on its cargo damage claim from Maersk. Maersk contractually assumed responsibility for the entire transportation and specifically assumed BNSF's responsibility for cargo damage occurring during inland carriage in the United States while in BNSF's custody.

## **CONCLUSION**

Crown's claims in this case are governed by the terms and conditions of Maersk's multimodal bill of lading, wherein Maersk agreed to accept, transport and deliver Crown's cargo in interstate and international commerce between two points in the United States and Australia.  As per the terms of Maersk's multimodal bill of lading and the BNSF Intermodal Rules, Maersk is fully liable to Crown.

The Order granting Maersk's motion for summary judgment should be vacated and reversed and summary judgment awarded to American Home for the full amount of its damages, plus prejudgment interest at the rate of nine percent per annum from the date of the loss.[6]

---

[6] Specifically, clause 6.2(d) in the Bill of Lading provides that the law of the State of New York will apply.  Under N.Y.C.P.L.R. §5004, interest is calculated at a rate of nine percent per annum.  Maersk did not contest the imposition of prejudgment interest at the New York state rate of nine percent per annum.  Maersk only contested the calculation of interest on a compounded basis.  See, Document 75, page 3 of 11.  Appellant concedes that interest should be calculated on a simple basis.

Respectfully submitted,

By:   s/Edward C. Radzik
       Edward C. Radzik, Esq.
       John K. McElligott, Esq.
       Christopher J. DiCicco, Esq.
       Marshall Dennehey Warner Coleman &
           Goggin
       Wall Street Plaza, 88 Pine Street, 21st Floor
       New York, NY 10005
       Tel: (212) 376-6439; Fax: (212) 376-6490
       E-mail:   ECRadzik@mdwcg.com
                 JKMcElligott@mdwcg.com
                 CJDiCicco@mdwcg.com

*Attorneys for Plaintiff/Appellant American Home Assurance Company as subrogee of Crown Equipment Corporation*

Dated: July 29, 2014

33

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

I hereby certify that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(b), because it contains 6,757 words, excluding parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 and 14-point Times New Roman font.

Respectfully submitted,

By:    s/Edward C. Radzik
       Edward C. Radzik, Esq.
       John K. McElligott, Esq.
       Christopher J. DiCicco, Esq.
       Marshall Dennehey Warner Coleman &
            Goggin
       Wall Street Plaza, 88 Pine Street, 21st Floor
       New York, NY 10005
       Tel: (212) 376-6439; Fax: (212) 376-6490
       E-mail:    ECRadzik@mdwcg.com
                  JKMcElligott@mdwcg.com
                  CJDiCicco@mdwcg.com

       *Attorneys for Plaintiff/Appellant American Home Assurance Company as subrogee of Crown Equipment Corporation*

Dated: July  29, 2014

34

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 29, 2014, I filed the foregoing Appellant's Brief with the Clerk of the Court via CM/ECF, which will send a notice and service of electronic filing to the following:

Paul D. Keenan
Keenan Cohen & Howard P.C.
165 Township Line Road, Suite 2400
Jenkintown, PA 19046

Christopher J. Merrick
Keenan Cohen & Howard P.C.
165 Township Line Road, Suite 2400
Jenkintown, PA 19046

By:    <u>s/ Edward C. Radzik</u>
         Edward C. Radzik

**SPECIAL APPENDIX**

**i**

**TABLE OF CONTENTS**

**Page**

Memorandum Opinion and Order of the Honorable
    Paul G. Gardephe, dated March 31, 2014 ..............   SPA-1

Judgment, dated March 31, 2014, Appealed From ....   SPA-20

SPA-1

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/31/14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AMERICAN HOME ASSURANCE a/s/o
CROWN EQUIPMENT,

               Plaintiff,

    v.

A.P. MOLLER-MAERSK,

               Defendant.

**MEMORANDUM**
**OPINION & ORDER**

07 Civ. 10947 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

       This action, formerly before the Honorable Barbara S. Jones,[1] arises from a 2006 train derailment near Newberry Springs, California. Plaintiff American Home Assurance, the subrogee of Crown Equipment Corporation, seeks to recover damages that the derailment caused to Crown's cargo, which was in the process of being shipped from Ohio and Indiana to Australia. Defendant A.P. Maersk, an ocean carrier, agreed to transport the goods pursuant to the terms of a "through bill of lading" – essentially a single shipping contract that covered the entire journey. Maersk subcontracted with BNSF Railway Company to complete the domestic rail portion of the trip.

       As a result of prior rulings in this action by Judge Jones and Chief Judge Preska, the narrow questions before this Court are whether (1) Maersk is liable to American Home under the Carmack Amendment to the Interstate Commerce Act; or (2) whether Maersk agreed that its liability for cargo damage would be determined in accordance with the Carmack Amendment. For the reasons set forth below, this Court concludes that Maersk is not a "rail carrier" under the Carmack Amendment, and that it did not agree that its liability would be determined in

---

[1] This matter was reassigned to this Court on May 29, 2013 (Dkt. No. 117).

SPA-2

accordance with the Carmack Amendment.  Accordingly, Maersk's motion for summary

judgment (Dkt. No. 108) will be granted.

## BACKGROUND

Crown, a manufacturer of forklift machinery and mechanical parts, booked an

international shipment of goods with Maersk, and then purchased insurance from American

Home to cover the full value of its cargo.  (Def. R. 56.1 Stmt. (Dkt. No. 111) ¶ 4, 11; Pltf. R.

56.1 Stmt. (Dkt. No. 114) ¶ 4, 11)  Having paid Crown's insurance claim, American Home now

seeks full recovery for the damaged cargo under the Carmack Amendment, a statute that

regulates domestic rail carriers and provides for near strict liability.  (Cmplt. (Dkt. No. 1) at 1)

Because Crown had covenanted not to sue any of Maersk's subcontractors,[2] American Home

chose to sue Maersk rather than BNSF.

In December 2006, Crown shipped three containers of construction equipment

from its facilities in Ohio and Indiana to Australia.  (Def. R. 56.1 Stmt. (Dkt. No. 111) ¶ 1)[3]

Crown's freight forwarder, Panalpina, Inc., contracted with Maersk to arrange delivery of the

goods from Illinois to their final destination in Australia.  (Id. ¶ 3)  The contract between

Panalpina and Maersk provided that Maersk's standard form bill of lading would apply.  (Id. ¶ 6)

"A bill of lading 'records that a carrier has received goods from the party that wishes to ship

them, states the terms of carriage, and serves as evidence of the contract for carriage.'"

---

[2] See Maersk Bill of Lading § 4.2, Merrick Decl., Ex. G (Dkt. No. 110); see also and Pltf. Opp.
Br. (Dkt. No. 112) at 2 n.1 ("Subsection 4.2 of Maersk's Multimodal Bill of Lading terms and
conditions purportedly prohibited plaintiff from suing BNSF directly.").
[3] Unless otherwise noted, citations to the parties' Local Rule 56.1 statements, including those
submitted in connection with prior motions, concern factual assertions that are admitted or are
deemed admitted because they were not contradicted by citations to admissible evidence.  See
Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . .
fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be
deemed admitted.").

Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp., 561 U.S. 89, __, 130 S.Ct. 2433, 2439 (2010) (quoting Norfolk Southern R. Co. v. James N. Kirby, 543 U.S. 14, 18-19 (2004)).  The bill of lading at issue here was intended to be a "through" bill of lading, i.e., a bill of lading that covered both the land-based and ocean segments of the journey.  (Def. R. 56.1 Stmt. (Dkt. No. 111) ¶ 9)

Although Maersk never issued a physical copy of its standard form bill of lading, it did issue electronic versions, and the parties do not dispute that the standard form bill of lading set forth the contractual terms of their relationship.[4]  (Id. ¶ 8)  Maersk's bill of lading contains several provisions that are relevant to this action.

First, the bill of lading provides for different loss calculations depending on where the damage to a shipment occurs.  For example, consistent with the Carriage of Goods by Sea Act (COGSA), the bill limits Maersk's liability to $500 per shipment "where the Carriage is Port-to-Port" or "where the stage of Carriage where loss or damage occurred is not known." (See Merrick Decl., Ex. G (Dkt. No. 110) ¶¶ 5.1 & 6.1(c)).  "[I]f the loss or damage is known to have occurred during Carriage inland in the USA," however, Maersk's liability is determined "in accordance with the contract of carriage or tariffs of any inland carrier. . . ."  (Id. ¶ 6.2(d)) Second, the bill of lading permits Maersk to subcontract "any part" of the transportation "on any terms whatsoever."  (Id. ¶ 4.1 ("The carriers shall be entitled to subcontract on any terms whatsoever the whole or any part of the carriage."))  Third, the bill includes a so-called "Himalaya Clause," which purports to extend the bill's liability protections to third-party

---

[4] Maersk's standard practice was to only issue a hard copy of the bill of lading once the goods were loaded on to its ocean vessels.  (Def. R. 56.1 Stmt. (Dkt. No. 111) ¶ 8)

subcontractors.[5]  (Id. ¶ 4.2 (providing that a "subcontractor shall have the benefit of all Terms

and Conditions of whatsoever nature herein contained or otherwise benefitting the Carrier"))

Fourth, the bill includes a covenant requiring the "Merchant," i.e., the shipper, not to sue any

entity other than Maersk, including Maersk's subcontractors.  (Id. ¶ 4.2 ("The Merchant

undertakes that no claim or allegation whether arising in contract, bailment, tort or otherwise

shall be made against any servant, agent or Subcontractor of the Carrier . . . ."))

       Pursuant to its bill of lading, Maersk arranged transportation for the entire journey

and subcontracted with BNSF to provide rail carriage in the United States.  (Def. R. 56.1 Stmt.

(Dkt. No. 111) ¶ 7)  The subcontract was governed by a pre-existing agreement between BNSF

and Maersk ("the International Transportation Agreement"), which incorporates BNSF's

Intermodal Rules & Policies Guide by reference.[6]  (BNSF R. 56.1 Stmt. (Dkt. No. 41) ¶¶ 7-8)

Item 63(3) of BNSF's Rules provides that (1) it shall not be liable for any loss or damages to

goods absent proof of negligence, and (2) in any event, its liability will be limited to $250,000

per shipment.  (Lenck Aff., Ex. F (Dkt. No. 30))

       BNSF accepted delivery of the shipments at its rail depots in Illinois on December

15, 2006, and December 18, 2006, and issued three separate movement waybills.  (BNSF R. 56.1

Smt. (Dkt. No. 41) ¶¶ 14, 18-19)  BNSF and American Home dispute whether these waybills

constitute additional bills of lading or merely documents similar to shipping receipts.  (Compare

id. at ¶¶ 17-20 with Pltf. Dec. 4, 2009 R. 56.1 Stmt. (Dkt. No. 45) ¶¶ 17-20)  What is not

disputed is that the train carrying these shipments derailed near Newberry Springs, California,

---

[5] "A Himalaya Clause extends contractual protections that would otherwise apply only to the entity issuing the bill of lading to the subcontractors of the issuing entity as well." Royal & Sun Alliance Ins., PLC v. Ocean World Lines, Inc., 612 F.3d 138, 142 (2d Cir. 2010).
[6] See also Am. Home Assur. Co. v. Panalpina, Inc., 07 CV 10947 BSJ, 2011 WL 666388, at *2 (S.D.N.Y. Feb. 16, 2011).

and that Crown's cargo was damaged.  (Pltf. March 8, 2012 R. 56.1 Stmt. (Dkt. No. 68) ¶¶ 3-4)

BNSF's investigation determined that the derailment was due to a track defect in a rail system

side joint bar.  (Id. ¶ 5)

## PROCEDURAL HISTORY

American Home filed this lawsuit on November 30, 2007, naming Maersk and

Panalpina as defendants and alleging claims for breach of contract, bailment and negligence.

(Cmplt. (Dkt. No. 1) at 3-5)  The case was assigned to Judge Jones.  On February 6, 2008,

Maersk impleaded BNSF pursuant to Fed. R. Civ. P. 14(c).  (Third-Party Cmplt. (Dkt. No. 7) ¶

16)  In its third-party complaint, Maersk sought indemnification from BNSF.  (Id. at 5)  In a

February 13, 2009 stipulation, American Home agreed to the dismissal of Panalpina from this

action.  (Dkt. No. 22)

Maersk and BNSF both moved for partial summary judgment in November 2009.

(Dkt. Nos. 29, 38)  BNSF argued that its liability to American Home, if any, is limited to $500

per package under COGSA.  (BNSF Partial Summary Judgment Br. (Dkt. No. 40) at 17-19)

Maersk sought, inter alia, summary judgment on its indemnity claim against BNSF.  (Def. Partial

Summary Judgment Br. (Dkt. No. 28))  American Home, in opposing the motions, argued that

the Carmack Amendment, and not COGSA, governs this case and that BNSF and Maersk are

both liable under its terms.  (Pltf. Opp. Br. (Dkt. No. 43) at 7-9)

The primary issue in this round of summary judgment briefing is which of two

statutes – the Carmack Amendment or COGSA – applies to the rail portion of an international

multi-modal shipping contract such as that at issue here.  That issue is critically important,

because these statutes impose radically different liability regimes on cargo carriers.  The

Carmack Amendment, which by its terms applies to rail and motor carriers, "imposes something

akin to strict liability on shippers[.]" <u>Mitsui Sumitomo Ins. Co. Ltd. v. Evergreen Marine Corp.</u>, 621 F.3d 215, 216 (2d Cir. 2010). COGSA, which covers ocean carriers, provides a more carrier-friendly negligence regime that includes a $500 per package damages limitation. <u>Id.</u>[7]

On February 11, 2011, Judge Jones issued a memorandum opinion and order denying BNSF's and Maersk's motions in their entirety. <u>Am. Home Assur. Co. v. Panalpina, Inc.</u>, 07 CV 10947 BSJ, 2011 WL 666388 (S.D.N.Y. Feb. 16, 2011) (Dkt. No. 58). Judge Jones accepted American Home's argument that the Carmack Amendment, and not COGSA, governs this case. According to Judge Jones, Carmack's "plain language . . . applies when the first rail carrier in the chain of transportation accept[s] cargo at the shipment's point of origin." <u>Id.</u> at *4. Judge Jones likewise rejected BNSF's alternative argument that it had contracted out of Carmack liability. <u>Id.</u> at *6. She found that "Crown was never offered full Carmack liability by either Maersk or BNSF." <u>Id.</u> Although Judge Jones concluded that the Carmack Amendment governs this case, she did not address American Home's contention that Maersk is liable as a "rail carrier" under that statute. (Pltf. Opp. Br. (Dkt. No. 43) at 11-13) Finally, Judge Jones rejected as premature Maersk's motion for partial summary judgment on its indemnity claim against BNSF, given that liability for the damaged goods had not yet been determined. <u>Am. Home Assur. Co.</u>, 2011 WL 666388, at *7.

---

[7] The significant differences between these statutes have led ocean carriers to insert "Himalaya clauses" into their standard-form bills of lading, in an attempt to extend COGSA's protections to all subcontractors, including domestic rail carriers. In a 2010 decision, the Supreme Court held that the Carmack Amendment does not displace such contract provisions where the contract at issue involves an <u>import</u> shipment. <u>Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp.</u>, 561 U.S. 89, ___, 130 S.Ct. 2433, 2439 (2010). <u>Regal-Beloit</u> does not address whether the same rule applies in the <u>export</u> context at issue here. <u>See Regal-Beloit</u>, 130 S.Ct. at 2444 ("Today's decision need not address the instance where goods are received at a point in the United States for export.").

On March 9, 2012, American Home moved for summary judgment on liability and damages, asserting that BNSF and Maersk were both liable pursuant to the Carmack Amendment. (Dkt. No. 69) Before that motion was decided, however, Maersk and BNSF entered into a stipulation of dismissal, in which Maersk agreed to dismiss its third-party complaint against BNSF pursuant to Fed. R. Civ. P. Rule 41(a)(1)(A)(ii). (Dkt. No. 90) American Home objected to the stipulation of dismissal. (Jan. 4, 2013 Order (Dkt. No. 91) at 4) Because BNSF had been impleaded by Maersk pursuant to Fed. R. Civ. P. 14(c), American Home argued that its consent was required before BNSF could be dismissed from the action. (Id.)

Rule 14(c) provides that "[i]f a plaintiff asserts an admiralty or maritime claim under Rule 9(h), the defendant . . . may, as a third-party plaintiff, bring in a third-party defendant who may be wholly or partly liable – either to the plaintiff or to the third party-plaintiff . . . ." Fed. R. Civ. P. 14(c). Courts have held that where "'such a demand is made, the action is treated as if the plaintiff had commenced it against the third-party defendant as well as the third-party plaintiff who is the original defendant in the lawsuit.'" (Jan. 4, 2013 Order (Dkt. No. 91) at 3-4) (citing Shipping Corp. v. American Bureau of Shipping, No. 54 Civ. 1920, 1989 WL 97821, at *1 (S.D.N.Y. Aug. 17, 1989)) Maersk and BNSF contended, however, that Rule 14(c) was no longer applicable, because the Court had determined that the Carmack Amendment applied, and thus American Home's claims were not maritime in nature. (Id. at 4)

On January 4, 2013, Judge Jones issued an order rejecting that argument and the proposed stipulation of dismissal. (Id. at 4-5) Judge Jones held that her "decision regarding the scope of BNSF's liability under the Carmack Amendment did not alter the maritime nature of

American Home's claims." (Id. at 5)  That same day, Judge Jones retired from the bench, and
the case was temporarily transferred to Chief Judge Loretta A. Preska.

BNSF sought reconsideration of Judge Jones's order. (Dkt. No. 92)  On March
12, 2013, Judge Preska granted that motion. (Mar. 12, 2013 Order (Dkt. No. 97))  Although
Judge Preska declined to revisit Judge Jones's earlier summary judgment determination, she
concluded that the January 4, 2013 order was erroneous in that "the Carmack Amendment
provides the exclusive remedy for a shipper's compensation for actual loss or injury." (Id. at 4
(citing Cleveland v. Beltman North Am. Co., Inc., 30 F.3d 373, 380-81 (2d Cir. 1994)))  In other
words, once Judge Jones decided that the Carmack Amendment applies to the loss at issue, any
maritime claims were necessarily pre-empted. (Id. at 6 ("[T]he Carmack Amendment governs
the entire scope of Plaintiff's claims and . . . such claims are non-maritime in nature."))  To find
otherwise "would be to impose two separate and parallel liability regimes for the exact same
damage under a bill of lading," a result that "would appear to be in conflict with" Supreme Court
precedent. (Id. at 5 (citing Regal-Beloit, 130 S.Ct. at 2447) ("Applying two different bill of
lading regimes to the same through shipment would undermine COGSA and international
container-based multimodal transport.")))  Accordingly, Judge Preska vacated Judge Jones's
January 4, 2013 order and "so ordered" the stipulation dismissing BNSF. (Id. at 7)

Judge Preska then stayed further briefing regarding American Home's summary
judgment motion, and granted Maersk permission to move for summary judgment. (Apr. 2, 2013
Order (Dkt. No. 107))  In its motion, Maersk argues that it cannot be held liable under the
Carmack Amendment because it is not a "rail carrier" within the meaning of that statute. (Def.
Br. (Dkt. No. 109) at 4-12)  American Home, in response, argues that it is not seeking to hold
Maersk liable under the Carmack Amendment; instead, American Home contends that Maersk

<u>agreed to be bound by</u> the Carmack Amendment's liability regime in its standard form bill of lading. (Pltf. Opp. Br. (Dkt. No. 112) at 4-8)

This case was transferred to this Court on May 29, 2013. (Dkt. No. 117) On September 26, 2013, this Court denied American Home's motion for summary judgment without prejudice, finding that Maersk's summary judgment motion presented a potentially dispositive issue that might obviate the need to rule on American Home's motion. (Dkt. No. 122) This Court further explained that it would reinstate American Home's summary judgment motion if it found that Maersk's liability is governed by the Carmack Amendment, either statutorily or contractually. (<u>Id.</u>)

## DISCUSSION

## I.    SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is warranted where the moving party "shows that there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." <u>Beyer v. Cnty. of Nassau</u>, 524 F.3d 160, 163 (2d Cir. 2008) (citing <u>Guilbert v. Gardner</u>, 480 F.3d 140, 145 (2d Cir. 2007)).

A court deciding a summary judgment motion must "'resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'" <u>Spinelli v. City of New York</u>, 579 F.3d 160, 166 (2d Cir. 2009) (quoting <u>Brown v. Henderson</u>, 257 F.3d 246, 251 (2d Cir. 2001)). However, a "'party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create

a genuine issue of material fact where none would otherwise exist.'" Hicks v. Baines, 593 F.3d

159, 166 (2d Cir. 2010) (alterations in original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451,

1456 (2d Cir. 1995)).

## II.  THE CARMACK AMENDMENT

The Carmack Amendment to the Interstate Commerce Act, enacted in 1906,

provides in relevant part:

> A rail carrier providing transportation or service subject to the jurisdiction of the
> [Surface Transportation] Board under this part shall issue a receipt or bill of
> lading for property it receives for transportation under this part. That rail carrier
> and any other carrier that delivers the property and is providing transportation or
> service subject to the jurisdiction of the Board under this part are liable to the
> person entitled to recover under the receipt or bill of lading.

49 U.S.C.A. § 11706 (emphasis added).  The Interstate Commerce Act defines a "rail carrier" as

"a person providing common carrier railroad transportation for compensation[.]"  49 U.S.C. §

10102(5).

## III.  THE PARTIES' ARGUMENTS

Maersk presents a straightforward argument in support of its summary judgment

motion.  Pursuant to Judge Preska's March 12, 2013 order, it is the law of the case that the

Carmack Amendment "governs the entire scope of Plaintiff's claim."  (Mar. 12, 2013 Order

(Dkt. No. 97) at 6)  Accordingly, for American to prevail, it must demonstrate that the Carmack

Amendment provides a statutory cause of action against an ocean carrier such as Maersk.

Maersk argues, however, that the Carmack Amendment is limited, by its plain terms, to "rail

carriers," and that Supreme Court and Second Circuit cases interpreting the Carmack

Amendment mandate this conclusion.  (Def. Br. (Dkt. No. 109) at 4-12 (citing Regal-Beloit, 130

S.Ct. at 2439-40; Rexroth B.V. v. Ocean World Lines, Inc., 547 F.3d 351, 359-60 (2d Cir. 2008),

abrogation on other grounds recognized by Mitsui Sumitomo, 621 F.3d at 219 n.4)).

10

American Home appears to concede that the Carmack Amendment does not apply directly to ocean carriers such as Maersk.  However, American Home argues that Maersk is contractually liable because it "expressly agreed to be bound by the liability regime which would govern the inland carrier in whose custody the loss or damage occurred."  (Opp. Br. (Dkt. No. 112) at 5)  In response, Maersk contends that this argument is both procedurally foreclosed by the law of the case and substantively meritless.  (Def. Reply Br. (Dkt. No. 115) at 4-7)

## IV.    ANALYSIS

### A.    Maersk is Not Statutorily Liable Under the Carmack Amendment

In its own summary judgment motion – the motion that the Court denied without prejudice – American Home had argued that Maersk is statutorily liable under the Carmack Amendment.  (Pltf. Br. (Dkt. No. 73) at 8)  While American Home appears to have abandoned that argument in opposing Maersk's summary judgment motion, see Pltf. Br. (Dkt. No. 112), this Court has nonetheless considered whether there is a basis to hold Maersk statutorily liable under the Carmack Amendment.

The Supreme Court has explained that the Carmack Amendment is intended to "relieve shippers of the burden of searching out a particular negligent carrier from among the often numerous carriers handling an interstate shipment of the goods."  Reider v. Thompson, 339 U.S. 113, 119 (1950).  "In cases where it applies, Carmack imposes upon 'receiving rail carrier[s]' and 'delivering rail carrier[s]' liability for damage caused during the rail route under the bill of lading, regardless of which carrier caused the damage."  Regal-Beloit, 130 S.Ct. at 2441 (quoting 49 U.S.C. § 11706(a)).  Freight forwarders may also be subject to Carmack Amendment liability under certain circumstances.  49 U.S.C. § 14706(a)(2).  Accordingly, in deciding whether Maersk may be held liable under the Carmack Amendment, this Court must

11

determine whether Maersk can be considered a receiving or delivering rail carrier or a freight forwarder.

Maersk is plainly not a receiving rail carrier. "A receiving rail carrier is the initial carrier, which 'receives' the property for domestic rail transportation at the journey's point of origin." Regal-Beloit, 130 S.Ct. at 2443. It is undisputed that BNSF, and not Maersk, received Crown's cargo "at the journey's point of origin [in Illinois]." (See Pltf. Br. (Dkt. No. 73) at 7) Moreover, "[a] carrier does not become a receiving carrier simply by accepting goods for further transport from another carrier in the middle of an international shipment under a through bill." Id. at 2445.

Maersk is also not a delivering carrier. Under the Carmack Amendment, a delivering carrier "is deemed to be the rail carrier performing the line-haul transportation nearest the destination." 49 U.S.C. § 11706(a) (emphasis added). Such a carrier must also "provid[e] transportation or service subject to the jurisdiction of the [Surface Transportation] Board under this part." Id. Under 49 U.S.C. § 10501(b), the STB's jurisdiction over railroad carriers is "exclusive." Ocean carriers, by contrast, are subject to the jurisdiction of the Federal Maritime Commission ("FMC") under 46 U.S.C. § 40102. See Regal-Beloit, 130 S.Ct. at 2448 (noting that "ocean vessels . . . are overseen by the Federal Maritime Commission" while "[r]ail carriers . . . remain subject to the STB's regulation to the extent they operate within the United States"); Rexroth, 547 F.3d at 356-57 (explaining that ocean carriers "are subject to the jurisdiction of the FMC, not the STB," and do not "qualify under Carmack as 'rail carriers' subject to STB jurisdiction"). Here, it is undisputed that Maersk is an ocean carrier, not a rail carrier. American Home has, in fact, conceded that BNSF – not Maersk – was both the receiving and delivering rail carrier here for purposes of the Carmack Amendment. (See Pltf. Br. (Dkt. No. 73) at 7) Because

12

Maersk is not a rail carrier subject to the jurisdiction of the STB, it does not qualify as a delivering carrier.

Finally, contrary to American Home's prior assertions, see (Dkt. No. 80) at 4-5, Maersk is not a freight forwarder under the Carmack Amendment. The Second Circuit has explained that "[a] freight forwarder . . . simply facilitates the movement of cargo to the ocean vessel. . . . Freight forwarders generally make arrangement for the movement of cargo at the request of clients and are vitally different from carriers, such as vessels, truckers, stevedores or warehouses, which are directly involved in transporting the cargo." Prima U.S. Inc. v. Panalpina, Inc., 223 F.3d 126, 129 (2d Cir. 2000) (emphasis added). Under the Interstate Commerce Act, "freight forwarder means a person holding itself out to the general public (other than as a . . . water carrier) to provide transportation of property for compensation. . . ." 49 U.S.C. § 13102(8). Here, Maersk is necessarily excluded as a freight forwarder under both the Interstate Commerce Act's definition and the Second Circuit's interpretation of the Carmack Amendment. Under these authorities, it is clear that Panalpina, not Maersk, acted as Crown's freight forwarder in this case.

This Court's conclusion that Maersk is not statutorily liable under the Carmack Amendment is also dictated by Supreme Court and Second Circuit precedent. In Regal-Beloit, the Supreme Court held that an ocean carrier was not a receiving rail carrier, and hence was not required to issue a bill of lading under the Carmack Amendment, where it arranged for transportation of goods from China to the United States. According to the Regal-Beloit court, "[t]hat [the ocean carrier] chose to use rail transport to complete one segment of the journey under these essentially maritime contracts, does not put '[the ocean carrier] within Carmack's

reach and thus does not require it to issue Carmack bills of lading.'" <u>Regal-Beloit</u>, 130 S.Ct. at 2444 (internal citation and quotation marks omitted).

Likewise, in <u>Rexroth</u>, the Second Circuit noted that there is "no appellate authority to support the conclusion that providing rail transportation may also include the activity of arranging for – but not actually performing – rail transportation." <u>Rexroth</u>, 547 F.3d at 364. The <u>Rexroth</u> court also noted that the STB has itself limited the definition of "rail carriers" to direct participants in the industry. <u>Id.</u> The court went on to reject the notion "that an entity that merely arranges for rail transportation by a third party rail carrier is itself a 'rail carrier' subject to the Carmack Amendment." <u>Id.</u> The <u>Rexroth</u> court further explained that it would "not construe '[a] rail carrier providing transportation' to include another, separate class of common carriers that do not own or operate rail lines or other equipment used in connection with a railroad." <u>Id.</u>

For all of these reasons, the Court finds that Maersk is not statutorily liable under the Carmack Amendment.

### B.   <u>Maersk Did Not Contract Into Carmack Liability</u>

While appearing to concede that Maersk cannot be held statutorily liable under the Carmack Amendment, American Home argues that Maersk – through its bill of lading – nevertheless bound itself contractually to Carmack's terms. Before considering the merits of American Home's current argument, it is worth noting that both sides have directly contradicted earlier interpretations they offered of the key provisions in the bill of lading.

Maersk initially argued that its liability to American Home, if any, was capped at $250,000 per shipment, as a result of Section 6.2(d) of the bill of lading. (Def. Br. (Dkt. No. 31) at 12-13) Section 6.2(d) provides, in relevant part:

> Where the stage of Carriage where the loss or damage occurred is known . . . the liability of the Carrier . . . shall be determined. . . .

> (d) if the loss or damage is known to have occurred during Carriage inland in the USA, in accordance with the contract of carriage or tariffs of any inland carrier in whose custody the loss or damage occurred or, in the absence of such contract or tariff by the provisions of Clause 6.1, and in either case the law of the State of New York will apply . . . .

(Radzik Decl., Ex. 1 (Dkt. No. 113) § 6.2(d)).  Since Maersk's contract with BSNF incorporated BNSF's Rules, which in turn provided for a maximum recovery of $250,000 per shipment, Maersk reasoned that its liability, if any, was limited to that amount.  (Def. Br. (Dkt. No. 31) at 13)

American Home argued, however, that Maersk had contracted into Carmack liability by virtue of Section 6.2(a) of the bill of lading.  Section 6.2(a) provides that the carrier's liability is to be determined as follows:

> Where the stage of Carriage where the loss or damage occurred is known . . . the liability of the Carrier . . . shall be determined:

> (a) by the provisions contained in any international convention or national law which provisions:  (i) cannot be departed from by private contract to the detriment of the Merchant, and (ii) would have applied if the Merchant had made a separate and direct contract with the Carrier in respect of the particular stage of Carriage during which the loss or damage occurred . . . .

(Radzik Decl., Ex. 1 (Dkt. No. 113) § 6.2(a))  American Home "construe[d] § 6.2 Subsection (a)(i)(ii) to mean that Maersk's liability is determined by the Carmack Amendment, the national law which cannot be departed from without independent notice to the shipper required under the Staggers Act, and which would have applied if [American Home] had made a separate contract with BNSF for the rail portion of the carriage from Chicago to Long Beach."  (Pltf. Reply Br. (Dkt. No. 80) at 4)

15

American Home now argues, however, that § 6.2(d) – and not § 6.2(a) – is the governing provision in the bill of lading.  (Pltf. Opp. Br. (Dkt. No. 112) at 4-5)  This shift appears to evince American Home's belated recognition that the Second Circuit previously determined – in Royal & Sun Alliance Ins., PLC v. Ocean World Lines, Inc., 612 F.3d 138, 146-47 (2d Cir. 2010) – that the language from § 6.2(a) that American Home was relying on does not demonstrate an intent to contract into Carmack liability.

In Royal & Sun Alliance, the insurer made arguments similar to those of American Home based on nearly identical language in a bill of lading.  The relevant bill of lading language in Royal & Sun provided that the ocean carrier's

> liability for loss or damage to the cargo shall be determined by the provisions contained in any national law, which provisions cannot be departed from by private contract to the detriment of the Merchant, and would have applied if the Merchant had made a separate and direct contract with the Carrier in respect of the particular stage of the carriage where the loss or damage occurred and received as evidence thereof any particular document which must be issued in order to make such national law applicable.

612 F.3d at 146.  The Second Circuit rejected the insurer's argument that the ocean carrier had contracted into Carmack liability via this term.  The court explained that, "[b]ecause its provisions can be departed from by private contract, the Carmack Amendment . . . is not such a national law."  Id.

American Home has abandoned its argument under Section 6.2(a), and after six years of litigation now asserts – for the first time – that Section 6.2(d) is the governing clause.

Maersk, however, has also reversed course.  Having previously argued that Section 6.2(d) of the bill of lading defines its scope of liability, Maersk now argues that Section 6.2(d) has been rendered irrelevant by Judge Preska's finding that "the Carmack Amendment governs the entire scope of Plaintiff's claims and . . . such claims are non-maritime in nature."

(Mar. 12, 2013 Order (Dkt. No. 97) at 6)  Judge Preska also found that "Carmack's liability regime is inapposite to maritime contracts."  (Id. at 5 (citing Regal-Beloit, 130 S.Ct. at 2449 ("[Congress] has not imposed Carmack's regime, textually and historically limited to the carriage of goods received for domestic rail transport, onto what are 'essentially maritime' contracts.")))  Hence, according to Maersk, American Home's contract claim under the bill of lading is now pre-empted.  (Def. Reply Br. (Dkt. No. 115) at 4)

Maersk also argues that Section 6.2(d) does not support American Home's assertion that Maersk contracted into Carmack liability.  According to Maersk, Section 6.2(d) is merely a choice of law provision that reflects the parties' agreement that New York law would govern any contract disputes between them.  (Id. at 6)  Given Judge Preska's finding that the Carmack Amendment – a federal law – "governs the entire scope of Plaintiff's claims," the choice of law provision in the bill of lading is – according to Maersk – no longer relevant.  (Id.)  Maersk also points out that, to the extent that the parties intended for New York law to govern this dispute, that would support a finding that Maersk intended to contract out of Carmack liability, not contract into it.  (Id.)

In response, American Home argues that (1) Royal & Sun is distinguishable, because it involved an import rather than an export shipment; and (2) under Section 6.2(d), "Maersk's liability to Plaintiff is governed by the liability regime that governs BNSF, an interstate rail carrier."  (Pltf. Opp. (Dkt. No. 112) at 5-7)

Neither argument is persuasive.  As to Royal & Sun, while that case involves an import shipment rather than an export shipment, there is no evidence that that fact had any bearing on the Second Circuit's holding that the relevant bill of lading provision – nearly identical to that at issue here – does not serve to bind an ocean carrier to the Carmack

Amendment's strict liability regime.  The holding in <u>Royal Sun</u> flows from the Second Circuit's conclusion that the Carmack Amendment is not a "national law" that "cannot be departed from." <u>Royal Sun</u>, 612 F.3d at 146.  There is no evidence that the import nature of the shipment played any role in the decision.

As for American Home's argument that Maersk contracted into Carmack liability through Section 6.2(d) of the bill of lading, that contention finds no support in the bill of lading's text.  Maersk did not agree, as American Home suggests, to be "governed by the liability regime that governs BNSF." (Pltf. Opp. Br. (Dkt. No. 112) at 7)  Rather, Section 6.2(d) is a choice of law provision providing that, in the event a shipment of goods is damaged during carriage in the inland United States, Maersk's liability is to be adjudged according to its contract with BNSF and in accordance with New York law.  There is no evidence that, in agreeing to this provision, the parties intended that Maersk would be bound by the liability rules set forth in the Carmack Amendment.

Having prevailed on its argument that the Carmack Amendment governs this case, American Home must live with the consequences.  The applicability of the Carmack Amendment here is the law of the case, as is Judge Preska's ruling that "the Carmack Amendment provides the exclusive remedy for a shipper's compensation for actual loss or injury."  <u>See Am. Home Assur. Co.</u>, 2011 WL 666388, at *5; March 12, 2013 Order (Dkt. No. 97) at 4)  Given that the Carmack Amendment does not apply to an ocean carrier such as Maersk, and given that Maersk did not contractually agree to be bound by the liability regime set forth in the Carmack Amendment, American Home has no claim under the Carmack Amendment against Maersk.

SPA-19

## CONCLUSION

For the reasons stated above, Maersk's motion for summary judgment is granted.

The Clerk of the Court is directed to terminate the motion (Dkt. No. 108) and to close this case.

Dated: New York, New York
       March 31, 2014

SO ORDERED.

Paul G. Gardephe
United States District Judge

**SPA-20**

USDC SDNY

DOCUMENT

ELECTRONICALLY FILED 3/31/2014

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

American Home Assurance Company
*as suborgee of Crown Equipment Corporation*,

                     Plaintiffs,

        -against-

A.P. Moller-Maersk A/S
*and/or Maersk Lines doing business as Maersk-Sealand*,

                   Defendants.
-----------------------------------------------------------X

07 **CIVIL** 10947 (PGG)

**JUDGMENT**

       Defendant having moved for summary judgment pursuant to Fed. R. Civ. P. 56, (Doc. #108)

and the matter having come before the Honorable Paul G. Gardephe, United States District Judge,

and the Court, on March 31, 2014, having rendered its Memorandum Opinion & Order (Doc. #126)

granting  Defendant's motion for summary judgment, it is,

       **ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the

Court's Memorandum Opinion & Order dated March 31, 2014, Defendant's motion for summary

judgment is granted; accordingly, the case is closed.

**Dated:**  New York, New York
       March 31, 2014

                              **RUBY J. KRAJICK**
                         _____
                              **Clerk of Court**

               **BY:**
                         _____
                              **Deputy Clerk**